## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

LAWRENCE B. BRADFIELD,

                Plaintiff,

v.

HEARTLAND PAYMENT SYSTEMS, LLC,

                Defendant.

Civ. Action No.: 3:17-cv-04862-FLW-TJB

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR CONTRACTUAL ATTORNEY'S FEES

---

Matthew V. DelDuca
Jeffrey A. Carr
**PEPPER HAMILTON LLP**
(A Pennsylvania Limited Liability Partnership)
Suite 400
301 Carnegie Center
Princeton, New Jersey 08543-5276
(609) 452-0808

*Attorneys for Plaintiff, Lawrence B. Bradfield*

Dated:  May 21, 2018

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT .......................................................................... 1

II. BACKGROUND FACTS ................................................................................... 3

    A.  Mr. Bradfield's HPS Employment and Resignation ............................... 3

    B.  Mr. Bradfield's Wage Claims .................................................................. 4

        1.  HPS's failure to provide information for Mr. Bradfield to determine whether he was properly compensated. ..................... 6

        2.  Mr. Bradfield elects to voluntarily dismiss his wage claims. ................ 15

III. LEGAL ARGUMENT ..................................................................................... 16

    A.  The Prevailing Party Standard ............................................................... 16

    B.  Defendant HPS is Not a Prevailing Party ............................................. 19

    C.  This Case is Distinguishable from *Rogers* and *Bricklayers* .................. 22

    D.  The Court Should Not Award Attorney's Fees to HPS as a Matter of Policy ...................................................................................................... 25

IV. CONCLUSION ............................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AeroTech, Inc. v. Estes*, 110 F.3d 1523 (10th Cir. 1997)............................................17

*Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975) ..................25

*Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151 (3d Cir. 2001)........................25

*Bricklayers & Allied Craftworkers Local 1 of Pa/De v. ARB Constr., Inc.*, 2016 U.S. Dist. LEXIS 128954 (E.D. Pa. 2016) ....................................15, 21, 23, 24, 25

*Bridgeport Music, Inc. v. London Music, UK*, 345 F. Supp. 2d 836 (M.D. Tenn. 2004) ......................................................................................................20, 21, 22, 23

*Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001)........................................................................................... passim

*Cauley v. Wilson*, 754 F.2d 769 (7th Cir. 1985) .........................................................20

*Chambers v. Ohio Dep't of Human Servs.*, 273 F.3d 690 (6th Cir. 2001)....................16

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) ......................................25

*Community Realty Management, Inc. v. Harris*, 155 N.J. 212 (1998) .........................26

*Cornell v. Pirates' Pension Bd. of Dirs.*, No. 2006-100, 2008 U.S. Dist. LEXIS 93369 (D.V.I. Oct. 27, 2008) .............................................................................17, 18

*Degussa Admixtures, Inc. v. Burnett*, 471 F. Supp. 2d 848 (W.D. Mich. 2007) ..........19

*Department of Environmental. Protection v. Ventron Corp.*, 94 N.J. 473 (1983)........26

*Dowdell v. Univ. of Med. & Dentistry*, 94 F. Supp. 2d 527 (D.N.J. 2000).....................4

*First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007 (7th Cir. 1985) .............................................................................................................15

*John Evans Sons, Inc. v. Majik-Ironers, Inc.*, 95 F.R.D. 186 (E.D. Pa. 1982) ............20

*Key Tronic Corp. v. United States*, 511 U.S. 809 (1994) ............................................24

*Lawrence v. Fuld*, 32 F.R.D. 329 (D. Md. 1963)........................................................18

*Lum v. Mercedes Benz, USA, LLC*, 246 F.R.D. 544 (N.D. Ohio 2007)................17, 19, 20, 21, 22

*McGuire v. City of Jersey City*, 125 N.J. 310 (1991).............................................25, 26

*McKnight v. 12th Div. Props., LLC.*, 709 F. Supp. 2d 653 (6th Cir. 2010)............................15, 16

*Munchkin, Inc. v. Luv N' Care, Ltd.*, 2018 U.S. Dist. LEXIS 75221(C.D. Cal.
   May 2, 2018)....................................................................................................................17, 20

*North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 158 N.J. 561 (1999)........................26

*Opdycke v. Stout*, 233 Fed.Appx. 125 (3d Cir. 2007)...................................................................4

*Paramount Aviation Corp. v. Agusta*, 178 F.3d 132 (3d Cir. 1999)............................................4

*Peschke Map Techs. LLC v. Miromar Dev. Corp.*, No. 2:15-cv-173-FtM-38MRM,
   2016 U.S. Dist. LEXIS 50926 (M.D. Fla. Apr. 15, 2016)......................................................17

*Raab v. City of Ocean City*, 833 F.3d 286 (3d Cir. 2016) ...............................................17, 21, 25

*Rendine v. Pantzer*, 141 N.J. 292 (1995) ....................................................................................25

*Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883 (3d Cir. 1997) ......................................4

*Smoot v. Fox*, 353 F.2d 830 (6th Cir. 1965) ..........................................................................17, 18

*Technidata Am., LLC v. SciQuest, Inc.*, Civil Action No. DKC 2007-1754, 2009
   U.S. Dist. LEXIS 81862 (D. Md. Sep. 9, 2009) ..............................................................18, 23

*Toms v. Taft*, 338 F.3d 519 (6th Cir. 2003) ................................................................................23

*United States v. Alpha Med., Inc.*, 102 F. App'x 8 (6th Cir. 2004) ............................................22

*United States v. Estate of Rogers*, No. 1:97-cv-461, 2003 U.S. Dist. LEXIS 20171
   (E.D. Tenn. Apr. 3, 2003) (hereinafter Rogers)....................................................15, 21, 22, 23

*Welter v. E. I. Du Pont de Nemours & Co.*, 1 F.R.D. 551 (D. Minn 1941).................................17

## RULES

*Fed. R. Civ. P.* 41(a)(2)...............................................................................15, 17, 18, 19, 20

*Fed. R. Civ. P.* 54(d)(1)..........................................................................................................15, 16

Request Nos. 3, 9, 10-12 ...............................................................................................................6

Rule 12(b)(6)................................................................................................................................23

Plaintiff, Lawrence B. Bradfield ("Mr. Bradfield"), by and through his undersigned counsel, respectfully submits the following Memorandum of Law in Opposition to Defendant Heartland Payment Systems, LLC's ("HPS") Motion for Contractual Attorney's Fees, Docket Entry No. 30.

## I.    PRELIMINARY STATEMENT

HPS is seeking an award of counsel fees claiming it is a prevailing party because Mr. Bradfield voluntarily dismissed with prejudice his wage claims.  Nothing can be further from the truth.  HPS caused Mr. Bradfield to pursue this wage claim.  At the time Mr. Bradfield filed this suit, which is primarily aimed at obtaining a declaration that the non-competition agreement he was required to sign at HPS is unenforceable under California law, HPS had failed to make any commission payment when those commissions were due.  After Mr. Bradfield filed suit, HPS resumed commission payments to Mr. Bradfield, but HPS made huge deductions from Mr. Brdfield's earned commissions.  HPS failed to provide any explanation for the initial failure to pay commissions or for the large amounts HPS deducted from Mr. Bradfield's commissions, as HPS has consistently and repeatedly done to its former sales employees.  As a result, Mr. Bradfield was compelled to file and pursue his wage claims.

HPS had to be compelled in this suit to produce information explaining the large reductions in Mr. Bradfield's earned commissions.  The information HPS provided was incomplete – HPS only provided information through September 2017, and provided no information for the period after September through the date of Mr. Bradfield's voluntary dismissal.  The limited information HPS did provide was wrong in many cases and in many other instances, it was incomprehensible.  HPS also failed to provide critical information that would be necessary to evaluate whether HPS underpaid (or over deducted from) Mr. Bradfield's earned commissions.  As Mr. Bradfield made perfectly clear at his deposition, the information HPS

provided did not allow him to evaluate whether HPS had fully and properly paid him the commissions he earned, and to do so would require a full accounting.

Mr. Bradfield and his counsel evaluated the cost of continuing to pursue HPS for complete information against the amounts owed. Mr. Bradfield decided not to continue pursuing the wage claims and voluntarily dismissed them with prejudice. Not because the claims were groundless. They were not groundless. Not because of anything HPS did to prove its position correct. Indeed, the information HPS provided, if anything, proved Mr. Bradfield's claims that the deductions made were wrong.

In fact, if HPS had provided accurate information about the basis for the large deductions in commission payments to Mr. Bradfield at the time those deductions were taken, this wage claim would have been avoided. But HPS chose not to do that. That was no mistake. HPS routinely refuses to provide former employees with reasons for cutting off their earned commissions entirely or for making huge reductions in those commissions. Employees who want more information from HPS about why it has taken this action and how it arrived at the reductions in earned commissions are compelled to sue to get that information. And HPS then seeks counsel fees. This is all part of HPS's strategy to use the courts to punish its former employees and to scare its current employees into staying employed at HPS for fear of losing the residual commissions they earned from HPS. This court should not allow itself to be used by HPS in this executing this business strategy.

Now, HPS wants to be proclaimed the "prevailing party" and to be rewarded. HPS's motion argues that it is entitled to legal fees while ignoring the history of this case, its refusal to provide information to Mr. Bradfield, its production of woefully flawed "proof" that Mr. Bradfield was properly paid, and by selectively quoting Mr. Bradfield's deposition

testimony.  Neither the actual and complete facts here, the law, nor equity supports such an award and HPS's motion should be denied.

## II.     BACKGROUND FACTS

### A.     Mr. Bradfield's HPS Employment and Resignation

Mr. Bradfield is a former HPS sales employee who resigned from HPS on June 2, 2017.  Under HPS's sales commission agreement, Mr. Bradfield earned commissions on revenues HPS received from customers who Mr. Bradfield played a role in signing up to use HPS's credit card processing services and certain other services.  Under that same policy, Mr. Bradfield is entitled to receive commissions for each of those customers on an ongoing basis – even after his employment at HPS ended – for as long as that customer continued to use HPS's services.  These are referred to as residual commissions.  At the time he left HPS, Mr. Bradfield's total monthly residual commissions totaled between $2,000 and just under $3,000 per month.  Residual commissions earned in one month are supposed to be paid by HPS on the 15th of the following  month.

When Mr. Bradfield resigned on June 2, 2017, HPS sent Mr. Bradfield a letter demanding, among other things, that he comply with all of the restrictive covenants in certain agreements he signed during his employment.  Mr. Bradfield worked his entire career at HPS in California, and he left HPS to take a job for a competing credit card processor where he also works in California.  California law prohibits the enforcement of restrictive covenants HPS imposed on Mr. Bradfield and demanded he comply with.

After Mr. Bradfield resigned on June 2, 2017, he was due to receive a residual commission payment from HPS on June 15, 2017.  HPS did not make any payment to Mr. Bradfield.  HPS provided no explanation for failing to make the residual payment.

B.     Mr. Bradfield's Wage Claims

On June 30, 2017, Mr. Bradfield filed this lawsuit.  *See* Docket Entry No. 1, Complaint of Lawrence D. Bradfield.  The primary purpose of this lawsuit is to obtain a declaratory judgment that the restrictive covenants he signed while at HPS, which HPS demanded by letter that he comply with, are governed by California law and are unenforceable as a matter of California public policy.  *See Id.*, at ¶¶ 45-55 (Count I).  When the Complaint was filed on June 30, 2017, however, Mr. Bradfield still had received no residual commission payment from HPS and no explanation of why.  As a result, when Mr. Bradfield filed suit against HPS seeking a declaration that his post-employment restrictive covenants were unenforceable under California law, he included in the Complaint two counts related to the failure to pay commissions *See Id.* at ¶¶ 56-70 (Counts II and III).[1]

On or around July 15, 2017, after it was served with this lawsuit, HPS did make a residual commission payment to Mr. Bradfield.  HPS took significant deductions from that residual commission payment, however, and provided no explanation why, other than the reference in his pay stubs to "true-ups."  In the following months, HPS made monthly commission payments to Mr. Bradfield, but those payments also included significant deductions without any substantive explanation other than a reference to "true-ups."  Copies of the paystubs HPS provided to Mr. Bradfield are attached as Exhibit A to the Declaration of Matthew V.

---

[1] Mr. Bradfield was required to make these wage claims or risk having them barred by New Jersey's entire controversy doctrine that "requires a party to bring in one action all affirmative claims that it might have against another party. . .  or be forever barred from bringing a subsequent action involving the same underlying facts." *Opdycke v. Stout*, 233 Fed.Appx. 125, 129 (3d Cir. 2007) (quoting *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 885 (3d Cir. 1997)).  "[T]he entire controversy doctrine constrains a plaintiff from withholding part of a controversy for separate litigation even when the withheld component is a separate and independently cognizable cause of action." *Dowdell v. Univ. of Med. & Dentistry*, 94 F. Supp. 2d 527 , 534 (D.N.J. 2000)(*citing Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 137 (3d Cir. 1999)).

DelDuca ("DelDuca Decl.").  Again, HPS failed to provide any detail or other information about the large deductions HPS was taking from Mr. Bradfield's commissions.[2]  The following is a chart[3] of the gross commissions earned and the net commissions paid according to those HPS paystubs:

| Date of Payment | Gross Commission | Deductions | Net Commission |
|---|---|---|---|
| 6/15/2017 | $2,425.75 | $152.13 | $2,273.62 |
| 7/14/2017 | $2,442.45 | $34.22 | $2,408.23 |
| 8/15/2017 | $2,464.47 | $1,671.18 | $793.29 |
| 9/15/2017 | $2,625.19 | $1,959.47 | $665.72 |
| 10/13/2017 | $2,242.37 | $1,352.63 | $889.74 |
| 11/15/2017 | $2,190.10 | $756.14 | $1,433.96 |
| 12/15/2017 | $1,968.95 | $200.41 | $1,768.54 |
| 1/12/2018 | $2,014.93 | $1,169.95 | $844.98 |

True-ups occur with respect to signing bonus commissions sales employees like Mr. Bradfield earned at HPS.  When a new customer account is signed and begins processing credit card payments with HPS, HPS pays the sales person a "signing bonus" commission, which is a percentage of the estimated net revenues HPS expects to receive from that merchant in the first year the merchant processes credit cards with HPS.  In many cases, the signing bonus is

---

[2] HPS's failure to provide Mr. Bradfield information about not paying his June 15 commission and then paying significantly reduced commission amounts is not an isolated incident.  HPS has stopped paying commissions entirely to many former HPS employees, and when they ask why, HPS refuses to tell them.  *See e.g. Baston v. HPS*, 3:17-cv-07193; *Border v.HPS*, 3:17-cv-12270.  And, in instances like Mr. Bradfield's where HPS makes payments with significant deductions, HPS consistently refuses to provide any explanation or documents and then uses the circular argument that the former employees have no claims because cannot "prove" they were underpaid.  *See Findley, et al. v. HPS*, Dkt. No. OCN-C-70-18 (Ocean County Apr. 3, 2018), Complaint, at Exhibit E, attached to the DelDuca Decl. as Exhibit B.

[3] The "Gross Commission" is calculated by adding the amounts of the "CC-Residuals" and "AMEXOptBlueRes" on the paystubs attached to the DelDuca Decl. as Exhibit A.  The "Deductions" are calculated by adding the amounts of the "CC-SB True Ups" and "AMEXOptBlueTrue" on the paystubs attached to the DelDuca Decl. as Exhibit A.

50% of estimated net revenues, and in others is a lower percentage.  The signing bonus is paid

when the relationship with the merchant starts and is based on the estimated revenues from that

merchant for the ensuing year.  This process therefore involves estimating the customer's credit

card sales for the year along with other information.  At the end of the year, the actual net

revenues from the customer are known.  If the actual net revenues are less than the estimate used

to calculate the signing bonus, then the sales person owes back the difference to HPS.  This is

referred to as a negative true-up.  Similarly, if the actual net revenues received from the customer

are more than the estimate, then the salesperson is entitled to an additional amount as a signing

bonus – a positive true-up.  If the negative true-ups exceed the positive true-ups, then the sales

person is required to pay that negative balance to HPS.  A negative true-up balance and other

amounts the employee or former employee owes to HPS are referred to as "AR."

      1.     **HPS's failure to provide information for Mr. Bradfield to determine whether he was properly compensated.**

In this litigation Mr. Bradfield, through counsel, served HPS with discovery

directed to evaluate whether the commission payments HPS made to Mr. Bradfield and the

significant deductions were properly calculated.  *See* Lawrence B. Bradfield's First Set of

Interrogatories to Heartland Payment Systems, LLC, at Interrogatory Nos. 5, 9 attached to the

DelDuca Decl. as Exhibit C; *see also* Lawrence B. Bradfield's First Request for the Production

of Documents to Heartland Payment Systems, LLC, at Request Nos. 3, 9, 10-12, attached to the

DelDuca Decl. as Exhibit D.  In December, 2017, HPS for the first time provided any

information about the calculation of Mr. Bradfield's commission payments after his termination.

HPS provided a spreadsheet that purports to provide information about the residuals earned and

adjustments made by HPS.  *See* Bates Stamped Document HPS-Bradfield00000158 attached to

the DelDuca Decl. as Exhibit E (hereinafter "Document 158")*.*  On January 4, 2018, HPS

provided another spreadsheet that, according to its metadata, is a modified version of the spreadsheet produced in December.  *See* Bates Stamped Document HPS-Bradfield00000181 attached to the DelDuca Decl. as Exhibit F (hereinafter "Document 181").  Document 181, produced on January 4, 2018, is designated by HPS as Attorneys Eyes Only.  As a result, Mr. Bradfield's counsel was required to ascertain the accuracy and limitations of Document 181 without showing it to Mr. Bradfield.[4]  On January 15, 2018, HPS produced an additional spreadsheet that is necessary to determine the active and terminated customers in Mr. Bradfield's portfolio, which is necessary to evaluate certain major deductions in commission payments, called true-ups.  Again, the document was designated by HPS as Attorneys Eyes Only.

The documents HPS produced, i.e., Documents 158 and 181, are excel spreadsheets that include several tabs.  The first tab, entitled "1-1/2017 through 10-27-2017" purports to be a listing of all commissions Mr. Bradfield earned from HPS during 2017 up to October 15, 2017.[5]  The second tab in the spreadsheets are entitled "True-Ups."  This tab purports to identify true-ups form Mr. Bradfield's customers at HPS from January 1, 2017 through September 30, 2017.  The third tab is entitled "AR Detail" and purports to show the amounts of deductions from Mr. Bradfield's commissions taken from January 1, 2017 through October 11, 2017.  The fourth tab is entitled  "PBO –Forced for AR," which is not relevant here.

---

[4] Copies of Documents HPS-Bradfield00000158 and 181 are attached to the DelDuca Declaration, but are marked confidential.  To avoid any potential issue regarding the confidentiality of the information in those documents, they will be filed under seal.

[5] October 27, 2017, referred to in the title of this tab is apparently a reference to the date of the document.  The last entries for commissions earned are October 15, 2017, not October 27, 2017.

On January 30, 2018, HPS's counsel took Mr. Bradfield's deposition.[6]  HPS's counsel demanded that Mr. Bradfield identify specific customers for whom Mr. Bradfield was paid an incorrect commission.  The central point in HPS's motion is that Mr. Bradfield could not at his deposition identify specific commissions that were not properly paid and that Mr. Bradfield's claims are therefore "baseless" and "false."  But, Mr. Bradfield explained at his deposition that the spreadsheet HPS did provide that he was permitted to see did not provide all of the information needed to assess the accuracy of the commission payments, and most importantly the deductions.  Specifically, the most significant deductions are referred to as "true-ups."

The True-Ups tab on the spreadsheets provided by HPS include a number of columns that should allow one to see how the signing bonuses Mr. Bradfield received were calculated and how true-ups were made to those commissions.  The spreadsheets include the following columns that should allow one to evaluate the true-ups:

Column I, "SB Value" which identifies the percentage signing bonus Mr. Bradfield was entitled to receive for that customer.

Column J, "SB Paid Amount", which identifies the signing bonus paid to Mr. Bradfield when the customer was signed up.  This column should equal the figure in Column I ("SB Value") times Column N ("Estimated Margin").

---

[6]  At 5:49 p.m. on the night before Mr. Bradfield's deposition, HPS's counsel produced approximately 2,000 pages of documents.  It is clear from the documents that HPS's counsel had them in their possession for some time, and produced the large amount of documents at that very late date and hour for tactical reasons.  Buried within the large, dense production were documents that HPS planned to attack Mr. Bradfield with in his deposition.  The next morning, HPS demanded to begin the deposition promptly at 9:00 a.m.  As a result, Mr. Bradfield's counsel was forced to involve the Magistrate-Judge, who chastised HPS's counsel and provided Mr. Bradfield with adequate time to complete the review of the documents and prepare Mr. Bradfield for questions on them.

Column K, "Amount Earned" which is the amount of commission HPS determined Mr. Bradfield earned based on actual net revenues for the year.  This column should equal Column M ("Actual Margin") times Column I ("SB Value").

Column L, "SB True-Up Amt", the positive or negative (shown in parentheses) adjustment to true-up for that customer.  This column should equal Column K ("Amt Earned") minus Column J ("SB Paid Amount").

Column M, "Actual Margin" which is the actual net revenues received from the customer in the first 12 months.

Column N, "Estimated Margin" which is the amount of annual margin HPS estimates at the beginning of the relationship that HPS will ultimately receive from the customer for the first year of the relationship.

Mr. Bradfield pointed out at his deposition that the spreadsheet does not provide critical information for Column M, the critical actual margin or net revenue figure that is used to calculate the amount of bonus actually earned.  Without that information, Mr. Bradfield could not assess whether those totals were correct or whether HPS was applying adjustments to the gross revenue that resulted in reductions of the net revenues that then result in a reduction in the actual earned signing bonus.  He pointed this out to HPS's counsel at the deposition.  *See* Deposition Transcript of Lawrence B. Bradfield dated January 30, 2018, a copy of which is attached to the DelDuca Decl. as Exhibit G, (hereinafter "Bradfield Transcript"), at 27:18-29:15; 30:25-31:19; 37:3-40:3;40:14-20; 41:4-14; 42:22-44:20.  HPS completely ignores this undisputable fact in their motion.  HPS does this by the crafty use of ellipses to hide Mr. Bradfield's point.

HPS quotes the following portions of Mr. Bradfield's deposition:

Q: Can you identify for me each instance in which you contend you were owed a residual commission or any other form of compensation by Heartland and were not paid that compensation?

A: I cannot.

…

Q: And sitting here today, the truth is you don't know, one way or the other, whether or not you received all of the residual commissions that you should have received from June 15 of 2017 to the present because you claim you don't have all the details, is that right?

A: That's true.

…

Q:  Can you identify for me a single instance in which you should have received a signing bonus and you didn't receive it?

A: To recall that right this second, no, I can't.

…

Q: As you sit here today, based on everything you know, can you identify for me a single merchant for whom you contend you are owed a signing bonus?

A: Based on the information that you have given me, no.

HPS's ellipses hide the reasons Mr. Bradfield explained that he could not testify regarding his commission payments.

The first ellipsis above omits a lengthy, but very important, four-page exchange between HPS's counsel and Mr. Bradfield where he makes plain that his inability to determine his wages/commission is a direct result of HPS not provided him the information necessary to do so.  For example, in response to repeated questions on the calculation of his commissions or his claim that they were less than they had been historically, Mr. Bradfield testified:

-10-

- Based upon the documentation that I've been given from Heartland, I cannot confirm the amount of residuals that are owed to me. *See* Bradfield Transcript, at 27:18-24.

- Because of the lack of accounting that Heartland hasn't given me, I cannot tell you how much I was owed or how much I was paid because they have never revealed the calculations. *Id.* at 28:4-7.

- Well, my check was zero, so any possible compensation, whether residual, signing bonus, I have no idea because I was never given an accounting of those numbers, so I can't tell you what the number could be. *Id.* at 28:20-24.

- I can't tell you that. I was never given the accounting to tell me how much it was supposed to be. *Id.* at 29:8-10.

- Based upon the data I received from Heartland, I can't tell you those numbers. *Id. at* 29:14-15

- Without the proper documentation, I can't confirm that. *Id.* at 30:25-31:1.

- I've requested an accounting of each month and have not received it, which would give me the opportunity to calculate. *Id.* at 31:17-19

Perhaps more troubling is what was hidden by HPS's second ellipsis as in that omitted testimony, HPS acknowledges that it did not give Mr. Bradfield the information necessary to evaluate his wages/commissions:

> Q: And, it's possible **when you get that accounting information it will show** that you were paid exactly what you were owed and you may just have gotten less that you thing you should have because of AR And true-ups, correct?
>
> A: There's also a possibility I was dramatically underpaid as well.

*Id.* at 32:2-8 (emphasis added). Mr. Bradfield continued to explain the problem:

> The simple accounting of showing an RM or a TM, their monthly payout based upon the balances either in an AR balance or true-up compared to the paid out residuals will give you a net check. If you have those details in front of you, you could calculate you check instead of waiting until the 15th and you go check your bank account. So, they're grossly underpaid. If I had the accounting, I could verify that.

*Id.* at 32:23-33:6.  This too was omitted by HPS.  Finally, omitted by the third ellipsis in HPS's

moving brief is a detailed exchange between HPS's counsel and Mr. Bradfield regarding a

document HPS had actually produced, but still did not contain sufficient information for

Mr. Bradfield to calculate his payments.  That exchange confirmed that the document, Document

158 and identified as Exhibit 3 during Mr. Bradfield's deposition, was not complete and still

made it impossible for Mr. Bradfield to calculate his commissions.  The testimony is lengthy,

starts at 37:3 and continues through 47:20 and Mr. Bradfield only provides the following

examples of the problem with that Exhibit 3:

- There is a residual amount.  So how did you get to that amount?  What's the net margin and what was the calculation; 15 or 30%?  If you can look at this spreadsheet and you can give me what those calculations are, I could tell you which ones are wrong, but without that information, you're asking me to give you something that is impossible.  *Id.* at 39:20-40:3.

- Base on the information that you handed me in Exhibit 3, I cannot calculate whether there is an accuracy or inaccuracy of the document that you gave me, it's impossible.  *Id.* at 40:17-20.

- Prior to my resignation from Heartland, I was given the full amount of information that would make it—that would make it accurate for me to do me own calculations.  The exhibit that you had given me is inaccurate and its lacking information for me to make the calculation.  It's unfair for you to ask me to give you which ones are wrong without giving me all the information to make the calculation.  *Id.* at 41:6-14.

- I cannot give you a merchant that I am underpaid.  Based on the information that you have given me and sitting in front of me, I cannot calculate whether the residual commission is inaccurate or not.  And I don't think I can answer it any more than that way, being honestly and direct with you as I can.  You're asking me to give you information on something that I cannot because you have not provide me with the property calculations to do so.  *Id.* at 42:12-21.

- If Heartland is willing to give me the calculations based upon the numbers in which you derive this amount, which you can see in this column on Exhibit 3, I could.  Without those missing links, you'll never know.  Heartland will never know and I would never know.  It's

like doing a mathematical equation but I'm going to leave out steps three and four.  You can't do it.  *Id.* at 43:6-13.

HPS never provided Mr. Bradfield the additional information he said he needs to determine the accuracy of the commissions he received and the deductions HPS made to those commissions.

HPS relies on Exhibit 3, i.e., parts of Document 158, but that document does not remotely prove that HPS correctly paid Mr. Bradfield's commissions for several reasons.  First, the document only provides information on residuals until October 15, 2017 and on true-ups until September 30, 2017.  The wage claims were dismissed on May 2, 2018, and HPS provided no information about the accuracy of Mr. Bradfield's commissions or deductions from those commissions for the six months or more that from that date back to the information in Deposition Exhibit 3.  Second, the information that is provided in Deposition Exhibit 3 is woefully incomplete.  The document simply lists dollar values for a number of critical pieces of information, but there is no way to determine where those dollar values came from.  Third, for at least one critical data point, actual margin, HPS failed to state what factors went into that figure.  That is, what deductions did HPS make from the gross revenues received from the customer?  Without this information, one cannot assess whether HPS is calculating commissions consistent with the commission plan that was in effect when Mr. Bradfield worked at HPS.

Finally, Exhibit 3 to Mr. Bradfield's deposition is in many ways either inaccurate or incomprehensible.  That is, many of the calculations of true-ups charged to Mr. Bradfield in HPS's document are simply wrong.  We offer just 5 examples from the True-Ups tab, rows 40, 79, 85, 100 and 108.  There are many other similar examples.

| Row No. | SB VALUE (Column I) | SB PAID AMOUNT (Column J) | AMOUNT EARNED (Column K) | SB TRUE-UP AMOUNT (Column L) | ACTUAL MARGIN (Column M) | EST. MARGIN (Column N) |
|---|---|---|---|---|---|---|
| 40 | 0.25 | $4,718.94 | | $(4,023.75) | $8,295.80 | $18,875.74 |
| 79 | 0.5 | $ 1,500.00 | $ 184.24 | $ (1,315.76) | $ 1,228.24 | $ 3,000.00 |
| 85 | 0.5 | $ 402.50 | $ 199.01 | $ (203.50) | $ 398.01 | $ 240.00 |
| 100 | 0.5 | $ 1,050.00 | $ 31.79 | $ (1,018.22) | $ 211.90 | $ 2,100.00 |
| 108 | 0.5 | $ 1,637.00 | $ 1,415.33 | $ (221.68) | $ 2,830.65 | $ 245.00 |

For row 40, the actual margin ($8,295.80) times the SB Value (25%) should have yielded an SB Amount Earned of $2,073.93, but the document shows that HPS credited Mr. Bradfield with only $695.19 (the SB Amount Paid minus the SB True-Up).

For row 79, the SB Value (50%) times the Actual Margin ($1,228.24) equals $614.12, yet the Amount Earned in Column is only $184.24

For row 85, the Actual Margin ($398.01) in Column M exceeds the Estimated Margin ($240.00) in Column N.  This should result in a positive true-up, but instead results in a negative true-up of $203.50.  Either the Estimated Margin is wrong or several other data points are wrong.

For row 100, the SB Value of 50 % in Column I times the Actual Margin of $211.90 in Column M should result in an Amount Earned in Column K of $105.95, but HPS shows only $31.79 earned.

For Row 108, the Actual Margin ($2,830.65) in Column M far exceeds the Estimated Margin ($245.00) in Column N.  This should result in a large positive true-up, but instead results in a negative true-up of $221.68.  Again, either the Actual Margin is wrong or multiple other columns are wrong.

These are just a handful of examples of inaccurate and incomprehensible information in HPS's alleged proof that it paid Mr. Bradfield accurately. As noted above, the same alleged proof is deficient in terms of the time frame covered and the amount of detail it provided Mr. Bradfield and his counsel. As a result, HPS's proofs most certainly do not prove that HPS paid Mr. Bradfield properly. Indeed, these documents raise nearly as many questions as they answer.

2.    **Mr. Bradfield elects to voluntarily dismiss his wage claims.**

After receiving these documents from HPS, Mr. Bradfield's counsel and Mr. Bradfield reviewed them in detail. *See* DelDuca Decl. at ¶ 15. Mr. Bradfield and his counsel also evaluated the amount of resources and time it would take to obtain complete information from HPS and conduct further discovery as to whether the information HPS provided was accurate. *See* DelDuca Decl. at ¶ 16. It was likely that an expert would have to be engaged to perform a full accounting of Mr. Bradfield's pay. *See* DelDuca Decl. at ¶ 19. As a result, Mr. Bradfield had to make a decision whether more resources should be spent to continue pursuing the wage claim. *See* DelDuca Decl. at ¶ 18. At the same time, the amounts of the deductions to Mr. Bradfield's commissions had slowed. *See* DelDuca Decl. at ¶ 21. In addition, the true-ups, which represent the lion's share of the deductions, by their nature end twelve months after Mr. Bradfield's employment ended because true-ups are done twelve months after the customer was signed by Mr. Bradfield, and he obviously could not sign customers for HPS after he left the company. *See* DelDuca Decl. at ¶ 22. As a result, Mr. Bradfield and his counsel decided not to continue to pursue his claim for underpayment of commissions. *See* DelDuca Decl. at ¶ 23. This was not because those claims are groundless or unfounded, but because the cost to continue the pursuit outweighed the benefits to Mr. Bradfield. *See* DelDuca Decl. at ¶ 24.

III.     **LEGAL ARGUMENT**

    A.     <u>The Prevailing Party Standard</u>

        The Third Circuit has not addressed the issue of whether a plaintiff's voluntary dismissal pursuant to *Fed. R. Civ. P.* 41(a)(2) can render a defendant a "prevailing party." *See Bricklayers & Allied Craftworkers Local 1 of Pa/De v. ARB Constr., Inc.*, 2016 U.S. Dist. LEXIS 128954, *14 (E.D. Pa. 2016). In support of its motion, HPS relies on nonbinding decisions to argue that plaintiff's voluntarily dismissal of certain claims entitles HPS to be deemed a "prevailing party" deserving attorney's fees. This is because "[f]ederal courts have struggled to determine whether a defendant is the prevailing party when the plaintiff voluntarily dismisses the complaint with prejudice." *United States v. Estate of Rogers*, No. 1:97-cv-461, 2003 U.S. Dist. LEXIS 20171, at *4 (E.D. Tenn. Apr. 3, 2003) (hereinafter *Rogers*).

        It is important to note that the term "prevailing party" is not defined in the Agreement. Courts have held that when the term "prevailing party" is undefined in a contract, the term "prevailing party" will have the meaning given to it by case law under *Fed. R. Civ. P.* 54(d)(1). *McKnight v. 12th Div. Props., LLC.*, 709 F. Supp. 2d 653, 655 (6th Cir. 2010); *see also First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1015 (7th Cir. 1985). Courts refer to *Fed. R. Civ. P.* 54(d)(1) as the starting point of the analysis; however, in order to interpret the term "prevailing party" consistently within federal jurisprudence, a Court may also seek guidance "from other cases interpreting federal statutes allowing for fee-shifting in favor of a prevailing party." *McKnight*, 709 F. Supp. 2d at 655  (citing *Chambers v. Ohio Dep't of Human Servs.*, 273 F.3d 690, 693 n. 1 (6th Cir. 2001)); *see also Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602-03 (2001).

        In *Buckhannon*, 532 U.S. at 604, the Supreme Court held that for the purpose of awarding attorney's fees under federal statutes, a party is not a "prevailing party" until there has

been a material alteration of the legal relationship of the parties that is judicially sanctioned.  A

"'prevailing party' is one who has been awarded some relief by the court," such as a judgment on

the merits or a settlement agreement enforced through a consent decree.  *Id*. at 603-04.  In his

concurring opinion, Justice Scalia noted:

> when 'prevailing party' is used by courts or legislatures in the
> context of a lawsuit, it is a term of art. It has traditionally …meant
> the party that wins the suit or obtains a finding (or an admission) of
> liability.  Not the party that ultimately gets his way because his
> adversary dies before the suit comes to judgment; not the party that
> gets his way because circumstances so change that a victory on the
> legal point for the other side turns out to be a practical victory for
> him; and <u>not the party that gets his way because the other side
> ceases (for whatever reason) its offensive conduct.</u>

*Buckhannon*, 532 U.S. at 615 (Scalia, J., concurring) (emphasis added).

Although the Third Circuit has not addressed specifically whether a plaintiff's

voluntary dismissal with prejudice can render a defendant a prevailing party, the Third Circuit

has relied on the *Buckhannon* Court's analysis in determining whether a party prevailed.  The

Third Circuit has held that a "defendant's voluntary change in conduct, although perhaps

accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial

imprimatur on the change" between the legal relationship of the parties.  *See Raab v. City of

Ocean City*, 833 F.3d 286, 293 (3d Cir. 2016) (interpreting *Buckhannon*).  The Third Circuit

confirmed Justice Scalia's opinion that a voluntary change in conduct, although accomplishing

the opposing party's goals, does not necessarily meet the *Buckhannon* standard for conferring

"prevailing party" status.  *Id.*

Other federal courts applying the *Buckhannon* standard have determined that a

voluntary dismissal with prejudice does not confer prevailing party status on the other party.

*See, e.g., Lum v. Mercedes Benz, USA, LLC*, 246 F.R.D. 544, 547 (N.D. Ohio 2007); *Munchkin*,

*Inc. v. Luv N' Care, Ltd.*, 2018 U.S. Dist. LEXIS 75221(C.D. Cal. May 2, 2018) (holding that a

voluntary dismissal with prejudice pursuant to *Fed. R. Civ. P.* 41(a)(2) is a voluntary, rather than

judicially sanctioned, dismissal and cannot confer prevailing party status on defendants);

*Peschke Map Techs. LLC v. Miromar Dev. Corp.*, No. 2:15-cv-173-FtM-38MRM, 2016 U.S.

Dist. LEXIS 50926 (M.D. Fla. Apr. 15, 2016) (denying plaintiff's motion to dismiss pursuant to

*Fed. R. Civ. P.* 41(a)(2) as it would have prohibited the defendant from achieving prevailing

party status).  In fact, Courts have held that attorney's fees should only be awarded when a party

dismisses the opposing party *without* prejudice, and not when the dismissal is with prejudice.

*Smoot v. Fox*, 353 F.2d 830, 833 (6th Cir. 1965) ("The cases permit allowance of attorney's fees

against the dismissing party where the action is dismissed without prejudice.") (quoting *Welter v.*

*E. I. Du Pont de Nemours & Co.*, 1 F.R.D. 551 (D. Minn. 1941)); s*ee also AeroTech, Inc. v.*

*Estes*, 110 F.3d 1523, 1528 (10th Cir. 1997) (holding "a defendant may not recover fees when a

plaintiff dismisses an action with prejudice [pursuant to *Fed. R. Civ. P.* 41(a)(2)] absent

exceptional circumstances."); *Cornell v. Pirates' Pension Bd. of Dirs.*, No. 2006-100, 2008 U.S.

Dist. LEXIS 93369, at *4 (D.V.I. Oct. 27, 2008) (holding that the rationale for not permitting

defendant to recover fees when a plaintiff dismisses an action with prejudice is that "when a

plaintiff dismisses an action with prejudice, attorneys' fees are usually not a proper condition of

dismissal because the defendant cannot be made to defend again").  The Court in *Smoot* held

that:

> The reasoning behind the rule where the action is dismissed
> without prejudice is to compensate the defendant for expenses in
> preparing for trial in the light of the fact that a new action may be
> brought in another forum.  A dismissal with prejudice, however,
> finally terminates the cause and the defendant cannot be made to
> defend again. The Court in *Lawrence v. Fuld,* 32 F.R.D. 329 (D.
> Md. 1963) rejected the contention that there is no requirement in
> the Rule that limits it to dismissals without prejudice, and held that

>attorney's fees are not proper where the dismissal is with
>prejudice.

353 F.2d at 833 (emphasis added) (internal citations omitted).  There is a key difference between "recognizing that a dismissal with prejudice has preclusive effects on any future litigation and construing the opposing party as 'prevailing in litigation.'"  *Technidata Am., LLC v. SciQuest, Inc.*, Civil Action No. DKC 2007-1754, 2009 *U.S. Dist. LEXIS* 81862, at *12 (D. Md. Sep. 9, 2009).  Thus, in cases in which a party or certain claims are voluntarily dismissed with prejudice, as in this case, the dismissed party should not be deemed a "prevailing party" for the purposes of awarding attorney's fees.

The rule of law amongst the Circuits regarding whether a dismissal with prejudice pursuant to *Fed. R. Civ. P.* 41(a)(2) confers "prevailing party" status on the non-dismissing party is unsettled.  Although most Courts make decisions on this issue on a case-by-case basis, they look to the guiding principles of *Buckhannon* and other federal Courts in deciding whether such dismissal confers "prevailing party" status.   In this case, because Mr. Bradfield's dismissal of two claims with prejudice is voluntary pursuant to *Fed. R. Civ. P.* 41(a)(2), it lacks the necessary judicial determination on the change between the legal relationship of the parties to confer prevailing party status on HPS.  The voluntary dismissal is not a judgment on the merits, and does not alter HPS's behavior as a result.  Therefore, HPS cannot be a prevailing party as a result of Mr. Bradfield's voluntary dismissal.

B.      Defendant HPS is Not a Prevailing Party

Mr. Bradfield's voluntary dismissal of Counts II and III does not confer prevailing party status on HPS.  As discussed above, the Third Circuit has not ruled specifically on this issue and, therefore, this Court should refer to other federal courts for guidance. Following the cases discussed below, HPS is not a prevailing party because Mr. Bradfield's

-19-

dismissal did not materially alter the legal relationship of the parties, the dismissal was not a judgment on the merits, and the dismissal will not alter HPS's behavior moving forward.

Numerous federal courts have held that voluntarily dismissing a defendant with prejudice does not confer prevailing party status on the defendant and therefore the defendant is not entitled to attorney's fees.  This is because such dismissal does not materially alter the legal relationship between the parties and is not equivalent to a judgment on the merits.  For example, in *Lum*, the Court granted plaintiffs' motion to dismiss with prejudice pursuant to *Fed. R. Civ. P.* 41(a)(2), and denied defendant's motion for summary judgment and demand for costs, holding the defendant was not a prevailing party after plaintiff dismissed her case with prejudice." *Lum*, 246 F.R.D. at 547.  The Court explicitly stated that "attorney fees and expenses are not generally awarded where plaintiffs move to voluntarily dismiss with prejudice." *Id.* at 546 (citing *Degussa Admixtures, Inc. v. Burnett,* 471 F. Supp. 2d 848, 852 (W.D. Mich. 2007)).  The *Lum* Court further stated that although certain Courts have held that a plaintiff's voluntary dismissal makes the defendant a prevailing party entitled to costs and fees, the Supreme Court's *Buckhannon* ruling undermines those decisions.  *Id.*  Citing *Buckhannon*, the *Lum* Court explained that the appropriate focus post-*Buckhannon* is on "the nature and judicial involvement in the outcome, rather than its practical effects," because only focusing on the practical effects of a dismissal results in gross inconsistencies  *Id.* at 547 (citing *Bridgeport Music, Inc. v. London Music, UK*, 345 F. Supp. 2d 836, 839 (M.D. Tenn. 2004) (hereinafter "*London Music*")).  Applying this standard, the Court granted plaintiff's motion for voluntary dismissal, and denied the defendant's motion for summary judgment and demand for costs.  *Id.* at 547.  In this case, the result is even more compelling than in *Lum*, and this Court should find that Mr. Bradfield's voluntary dismissal does not meet the *Buckhannon* standard for conferring prevailing party status on HPS.

Other courts, like *Lum*, have held that a dismissal with prejudice pursuant to *Fed. R. Civ. P.* 41(a)(2) does not confer prevailing party status on the defendant and does not allow for the award of attorney's fees. *See e.g., Munchkin*, 2018 U.S. Dist. LEXIS 75221 (holding that a voluntary dismissal with prejudice pursuant to *Fed. R. Civ. P.* 41(a)(2) is a voluntary, rather than judicially sanctioned, dismissal and cannot confer prevailing party status on defendants);; *John Evans Sons, Inc. v. Majik-Ironers, Inc.*, 95 F.R.D. 186, 191 (E.D. Pa. 1982)[7] (not imposing award of attorney's fees to defendants after plaintiff dismissed its complaint with prejudice pursuant to *Fed. R. Civ. Pro.* 41(a)(2)); *Cauley v. Wilson*, 754 F.2d 769, 772 (7th Cir. 1985) (holding, "[f]ees are not awarded when a plaintiff obtains a dismissal *with prejudice* because the 'defendant cannot be made to defend again.'").

Based on the above caselaw, HPS is not and should not be declared a "prevailing party" because Mr. Bradfield's voluntary dismissal of certain claims with prejudice lacks the requisite judicial imprimatur to materially alter the legal relationship between the parties. *Raab*, 833 F.3d at 293. Finally, HPS should not be deemed a prevailing party simply because Mr. Bradfield ceased some of his "offensive conduct," as there was no judgment on the merits, and Count I still remains.

---

[7] In *John Evans Sons, Inc.*, the Court provided:

> There is no question that Rule 41(a)(2) authorizes a court to award costs and attorneys' fees as a condition of voluntary dismissal and numerous courts have done so where a voluntary dismissal has been granted *without prejudice*. The purpose of the awards in such cases is to compensate the defendant for having incurred the expense of trial preparation without the benefit of a final determination of the controversy. However, this consideration is not present in a case such as this where the dismissal is with prejudice. Indeed, it has been held that if the dismissal is with prejudice the court lacks power to require an attorney's fee to be paid, barring exceptional circumstances.

95 F.R.D. at 191 (internal citations omitted) (emphasis in the original).

C.    This Case is Distinguishable from *Rogers* and *Bricklayers*

In support of its motion, HPS cites to a number of District and Circuit Court cases that HPS asserts support its motion; however, those cases are distinguishable.  For instance, HPS relies upon *Rogers* and *Bricklayers*.  In both of those cases, however, the Court focused on the practical effects of a voluntary dismissal instead of the legal effects, and considered the factual history of the cases in determining whether to confer prevailing party status and award attorney's fees.  In *Rogers*, the Court determined that defendant was a prevailing party when plaintiff dismissed its complaint with prejudice.  *Rogers*, 2003 U.S. Dist. LEXIS 20171, at *14.

This Court should not be guided by the *Rogers* decision because that decision focused on the practical effect of a voluntary dismissal with prejudice rather than the legal effects of the dismissal.  Moreover, the Court's decision has been highly criticized.  Specifically, regarding *Rogers*, the *Lum* Court explained that:

> the [*Rogers*] court found that a defendant, against whom a case was voluntarily dismissed with prejudice, was a prevailing party …. The court emphasized the practical effects of a voluntary dismissal with prejudice and discounted the legal effects of such. *See United States v. Estate of Rogers,* 2003 U.S. Dist. LEXIS 20171, at 5 (E.D. Tenn. 2003) ("voluntary dismissal is a judicially sanctioned material alteration in the legal relationship between Alpha and plaintiff"). A focus on only the practical effects of a dismissal with prejudice would lead to gross inconsistencies.  *See Bridgeport Music, Inc. v. London Music, UK,* 345 F. Supp. 2d 836, 839 (M.D. Tenn. 2004).  Parties regularly terminate litigation as a result of private settlements by which the plaintiffs extract large monetary settlements from the defendants.  *Id.*  It is clear, however, that these settlements do not confer prevailing party status.  *See Buckhannon,* 532 U.S. at 604 ("private settlements do not entail judicial supervision and oversight").
>
> The Sixth Circuit, likewise, though it affirmed the lower court in *Rogers*, refused to adopt the court's finding that the non-moving litigant was a prevailing party. *See United States v. Alpha Med., Inc.,* 102 Fed. Appx. 8 (6th Cir. 2004) (refusing to decide whether a voluntary dismissal with prejudice makes the non-moving party a prevailing party).

*Lum*, 246 F.R.D. at 546 n.3 (emphasis added).  Most importantly, the *Lum* Court recognized that

the *Rogers* District Court improperly assumed the Sixth Circuit recognized voluntary dismissals

with prejudice as equivalent to a judgment on the merits based on the practical effects of the

voluntary dismissal.  *Id.* at 547.  Specifically, the Sixth Circuit, in deciding the *Rogers* appeal,

noted:

> There is no clear precedent, particularly in this circuit, as to
> whether a plaintiff's voluntary dismissal with prejudice…makes
> the defendant a "prevailing party" for purposes of an award of
> costs.
>
> …
>
> This was a lengthy and complex case with which the district court
> was closely familiar. Upon careful consideration, the district court
> concluded that it was appropriate to decline to award costs to
> [defendant] in this case [despite declaring defendant a prevailing
> party]. This conclusion was based upon the context in which the
> [plaintiff's] voluntary dismissal occurred.

*United States v. Alpha Med., Inc.*, 102 F. App'x 8, 10 (6th Cir. 2004).  As the *Lum* Court stated,

the Sixth Circuit's opinion on the *Rogers*' appeal explicitly refused to adopt the *Rogers* Court's

finding that the non-moving litigant was a prevailing party.  Thus, the *Rogers* decision to declare

the defendant a prevailing party was narrowly tailored to fit the facts of the case, was

conditioned on the context of the dismissal, and was not determined to be the rule of law

throughout the Sixth Circuit as HPS suggests.

In *London Music*, the Court further explained the *Rogers* Court's improper focus

on practical effects of the voluntary dismissal instead of the legal effects.  The Court stated:

> Nevertheless, the *Rogers* court emphasized the *practical effects* of
> voluntary dismissal with prejudice, and overlooked the *legal
> nature* of voluntary dismissal. It is true that a plaintiff's voluntary
> dismissal with prejudice has the same practical effect as a Rule
> 12(b)(6) dismissal on the merits – finality of the case and a res
> judicata bar to further litigation. However, those same effects are
> achieved every time a case is dismissed as the result of a private

-23-

> settlement between the parties, and it is clear in this Circuit that
> such settlements do not confer prevailing party status. *Buckhannon*
> at 604 n. 7; *Toms v. Taft*, 338 F.3d 519, 529 (6th Cir. 2003).

*London Music*, 345 F. Supp. 2d at 839-40.  Interpreting *Buckhannon*, the *London Music* Court acknowledged the distinction between recognizing that a dismissal with prejudice precludes future litigation, and construing the opposing party as prevailing.  *Id.*; *see also Technidata*, 2009 U.S. Dist. LEXIS 81862, at *12.  This Court should do the same.  The voluntary nature of Mr. Bradfield's dismissal is not legally equivalent to a dismissal on the merits as HPS suggests.  This Court did not make any determination or impose any terms or conditions on the dismissal that equate it to a judgment on the merits.  Thus, HPS cannot be deemed to be a prevailing party based on Mr. Bradfield's voluntary conduct.

HPS also cites to *Bricklayers*, a case in which the Court awarded attorney's fees to the defendant after plaintiff dismissed her statutory civil rights action with prejudice, and plaintiff's counsel "evidenced a disregard for court ordered deadlines."  *Bricklayers*, 2016 U.S. Dist. LEXIS 128954, at *2.  *Bricklayers* is distinguishable because in that case there was a statutory requirement to award attorney's fees at the Court's discretion, whereas in the instant matter, there is no statutory requirement to award fees to HPS.  *Id.* at *5.  Moreover, it appears a driving force in the Court's decision to deem the defendant a "prevailing party" and award the defendant attorney's fees was plaintiff's counsel poor conduct during the course of litigation, and the frivolousness of plaintiff's suit.  *See Id.* at *2, *7-8 (noting the vast majority of discovery issues, including disregard for court ordered deadlines, originating with plaintiff's counsel; and that plaintiff "did not address, let alone attempt to defend the merits of its withdrawn [ ] claim….").

The opposite can be said in this matter.  Unlike *Bricklayers*, in this case, the party seeking "prevailing party" status essentially forced Mr. Bradfield to file the wage claim by

stopping his commission payments without explanation.  In discovery, HPS produced alleged "proof" that it paid Bradfield correctly that did not remotely do so because they were woefully incomplete and in many cases incomprehensible.  Thus, during his deposition, Mr. Bradfield could not give certain answers to counsel questions because the documents presented to him were incomplete.  HPS is now relying on selective portions of that testimony to argue that Mr. Bradfield's claims were baseless.  Such conduct should not be rewarded.

The above two cases to which HPS cites should not persuade this Court because each case focuses on the practical effects of a voluntary dismissal instead of the legal effects, and considered the factual history of the cases in conferring prevailing party status and awarding attorney's fees.  Further, HPS should not be deemed the prevailing party based on its conduct during this litigation.  Finally, conferring prevailing party status on HPS and awarding fees runs contrary to both federal and state policy in awarding fees to a prevailing party.

D.     The Court Should Not Award Attorney's Fees to HPS as a Matter of Policy

Under the "American Rule", parties are ordinarily required to bear their own attorney's fees, and courts follow a general practice of not awarding fees to a prevailing party absent explicit statutory authority.  *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994).  A  prevailing party is not generally entitled to collect from the loser.  *Buckhannon*, 532 U.S. at 602 (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975)).  However, in certain circumstances, a "prevailing party" may be entitled to an award of reasonable attorneys' fees.  *See Raab*, 833 F.3d at 292.

Although the Third Circuit has held that a prevailing party can be either a plaintiff or a defendant, "the standard for awarding attorney's fees to prevailing defendants is more stringent than that for awarding fees to prevailing plaintiffs."  *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 157-58 (3d Cir. 2001).  Courts use a different standard in awarding

attorney's fees to a prevailing defendant than to a prevailing plaintiff. *Bricklayers*, 2016 U.S. Dist. LEXIS 128954, *4 (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 420-21 (1978) (noting that, "attorney's fee award to a successful defendant … should be permitted 'not routinely, not simply because he succeeds, but only where the action brought is found to be unreasonable, frivolous, meritless or vexatious.'"). "The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees." *Rabb*, 833 F.3d at 297 (citing *Hughes*, 449 U.S. at 14). Even if a plaintiff's allegations are ultimately "legally insufficient to require a trial," that alone is not enough to render the plaintiff's cause of action "groundless" or "without foundation." *Id.* at 297 (citing *Hughes*, 449 U.S. at 15-16).

Further, New Jersey has a strong policy disfavoring shifting attorneys' fees. *McGuire v. City of Jersey City*, 125 N.J. 310, 326 (1991). New Jersey Courts have generally adhered to the so-called "American Rule," meaning that "'the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.'" *Rendine v. Pantzer*, 141 N.J. 292, 322 (1995) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)). Although the basic approach and philosophy regarding the allowance of counsel fees has been "that sound judicial administration is best advanced if litigants bear their own counsel fees," *Department of Environmental. Protection v. Ventron Corp.*, 94 N.J. 473, 504 (1983), a party may agree by contract to pay attorneys' fees. *Community Realty Management, Inc. v. Harris*, 155 N.J. 212, 234 (1998). However, even where attorney-fee shifting is controlled by contractual provisions, courts will strictly construe that provision in light of the general policy disfavoring the award of attorney's fees. *North Bergen Rex Transport, Inc. v. Trailer Leasing Co.*, 158 N.J. 561, 570 (1999) (citing *McGuire*, 125 N.J. at 327).

Mr. Bradfield's claims were not frivolous, did not lack merit, and no exceptional circumstances exist to warrant an award of attorney's fees.  HPS <u>essentially compelled</u> Mr. Bradfield to bring this claim.  HPS did not, as it suggests, cause these claims to be dismissed by proving them to be false.  Indeed, the opposite is true.  HPS provided woefully deficient "proof".  Despite this, Mr. Bradfield made a decision not to continue to spend resources to force HPS to provide a complete and full accounting, which is what would have been needed to pursue the claims to a decision.  HPS's conduct both before and during the time the claims were active showed that HPS would cause Mr. Bradfield to pay a high price to find out whether or not HPS properly and fully paid him what he is owed.  HPS should not be rewarded for Mr. Bradfield's decision, based on a risk benefit analysis, that the cost of forcing HPS to provide him information he clearly is entitled to exceeded the benefits to him in the long run.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Bradfield respectfully requests that the Court deny HPS's Motion for Contractual Attorney's Fees because HPS is not a prevailing party.

Respectfully submitted,

*/s/Matthew V. DelDuca*

Matthew V. DelDuca
Jeffrey A. Carr
**PEPPER HAMILTON LLP**
(A Pennsylvania Limited Liability Partnership)
301 Carnegie Center
Suite 400
Princeton, NJ 08543
Dated:  May 21, 2018          *Attorneys for Plaintiff, Lawrence B. Bradfield*

-27-